Richard CALDWELL, Appellee,

v.

STATE of Tennessee, Appellant.

Supreme Court of Tennessee,
at Jackson.

Feb. 20, 1996.

Rehearing Denied March 18, 1996.

Charles W. Burson, Attorney General and Reporter, Michael E. Moore, Solicitor General, Glenn R. Pruden, Assistant Attorney General, Nashville, James W. Thompson, Assistant District Attorney, Twenty–Sixth Judicial District, for appellant.

David C. Stebbins, Columbus, Ohio, John G. Oliva, Nashville, TN, for appellee.

OPINION

DROWOTA, Justice.

The State of Tennessee appeals from the Court of Criminal Appeals' order reversing

the trial court's dismissal of Richard Caldwell's petition for post-conviction relief. The issue for our determination is whether the Court of Criminal Appeals erred in reversing the trial court's judgment and remanding the case for an evidentiary hearing to determine if the petitioner should be relieved, pursuant to our decisions in *Burford v. State*, 845 S.W.2d 204 (1992) and *Sands v. State*, 903 S.W.2d 297 (Tenn.1995), of the consequences of the expiration of the three-year limitations period applicable to post-conviction petitions.[1] For the reasons that follow, we conclude that the Court of Criminal Appeals did err, and therefore reverse its judgment and dismiss the petition for post-conviction relief.

### FACTS AND PROCEDURAL HISTORY

In October 1982 Richard Caldwell was convicted of the murder of Larry Climer and sentenced to death. This Court affirmed the conviction and sentence on direct appeal. *State v. Caldwell*, 671 S.W.2d 459 (Tenn. 1984).[2] Over the next several years, Caldwell filed two petitions for post-conviction relief, both of which were eventually dismissed by the trial court. These petitions were consolidated for purposes of appeal to the Court of Criminal Appeals, and that court denied relief in March 1990. We denied Caldwell's application for permission to appeal from that judgment.

Caldwell filed the petition that is the subject of this appeal in January 1993. In that petition Caldwell alleged that his initial arrest—which occurred in the early morning of March 28, 1981, for public drunkenness—was a pretext, being undertaken for the sole purpose of questioning him and gathering evidence against him concerning the disappearance of Carl Lipford.[3] Caldwell argued that this illegal arrest violated his rights under the state and federal constitutions to be free

from unreasonable seizures, and that all evidence obtained against him as a result of this pretextual arrest, including his confession, should have been suppressed. In the petition, Caldwell conceded that the illegal arrest claim was filed well beyond the limitations period applicable to post-convictions claims, which expired in July 1989. However, he argued that he was not aware of this claim until reviewing certain radio logs from law enforcement officials which indicated that police had been looking for him during the afternoon and evening of March 27, 1981, in connection with Lipford's disappearance. Furthermore, Caldwell asserted that these logs had not been available to him until the Court of Appeals, in an unpublished 1992 decision, held that police files concerning cases under collateral attack were "public records" pursuant to the Tennessee Public Records Act, thus ending the authorities' refusal to allow him to inspect the logs. Because these facts denied him a reasonable opportunity to litigate his pretextual arrest claim, Caldwell contended, he was entitled to be relieved of the expiration of the limitations period pursuant to *Burford.*

In response to this petition, the State filed a one-page motion to dismiss, arguing that the petition was time-barred. The trial court granted the motion on the following day. Caldwell then appealed from this judgment to the Court of Criminal Appeals.

That Court reversed the trial court's judgment as to the pretextual arrest claim and remanded the case to the trial court for an evidentiary hearing on that claim. The Court reasoned as follows:

> Because there was no evidentiary hearing, we cannot determine whether the state withheld any evidence of an unlawful arrest. And, even if so, whether the evi-

---

1. The limitations period is set forth in Tenn.Code Ann. § 40–30–102, which provides as follows: "A prisoner in custody under sentence of a court of this state must petition for post-conviction relief under this chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition shall be barred."

2. Caldwell had earlier been convicted of the murder of Carl Lipford. Although the Lipford

direct appeal was not published, that murder, which occurred on March 26, 1981—almost two months after the Climer murder and two days before Caldwell's initial arrest—is referred to in *Caldwell*, 671 S.W.2d at 463, n. 1.

3. A factual account of the arrest and the subsequent events is set forth in *Caldwell*, 671 S.W.2d at 462–63.

dence would have affected the admissibility of the confession. Finally, *Burford* supports the application of the three-year statute of limitations only when the petitioner had a prior opportunity to legitimately litigate the issue. Thus the trial court must also determine whether the information released pursuant to the Tennessee Public Records Act qualifies as an exception to the statute of limitations. That is, whether the information released sheds any new light on the subject of the admissibility of the confession.

Finally, even if a confession is found to be inadmissible as the fruit of an illegal arrest, any error by its introduction into evidence might be harmless in light of the other evidence. On direct appeal, our supreme court described the evidence as 'overwhelming.' Thus the trial court may consider the admission of the confession or any other evidence tainted by any pretextual arrest as harmless beyond a reasonable doubt.

After the Court of Criminal Appeals' judgment was handed down, both parties filed petitions to rehear, which were denied. Both parties then filed applications for permission to appeal with this Court. We granted the State's application in order to address the parameters of our *Burford* decision.

### ANALYSIS

Our analysis in this case obviously must begin with an examination of *Burford.* In that case, in 1976 the defendant Burford pleaded guilty to and was convicted of five counts of armed robbery in Wilson County. In November 1984 Burford was convicted of robbery with a deadly weapon in Wilson County; and the State used this conviction and the five 1976 convictions to establish Burford as a habitual criminal. As a result, he was sentenced to life.

In 1985, Burford was convicted of robbery with a deadly weapon in Trousdale County; and the State used this conviction along with the five 1976 convictions to have him sentenced as a persistent offender. The conviction and sentence were affirmed on appeal, and we denied Burford's application for permission to appeal in August 1986.

In 1988 Burford filed a petition for post-conviction relief in Wilson County, alleging that his 1976 convictions were invalid because he had not been advised of his right against self-incrimination before pleading guilty. In October 1988 the Wilson County Criminal Court agreed, vacating four of the 1976 convictions.

Burford then filed a post-conviction petition in Trousdale County in May 1990, alleging that because four of the underlying convictions were invalid, his current sentence, based on the 1985 persistent offender designation, was also erroneous. The State responded by alleging that the limitations period had expired in August 1989—three years after the action of the highest court to which an appeal was taken. The trial court dismissed the petition on statute of limitations grounds, and the Court of Criminal Appeals affirmed.

On appeal to this Court, Burford argued that the three year limitations period was facially unconstitutional in that it violated due process by barring otherwise meritorious claims with an arbitrary time limitation. We rejected this contention, holding that although the petitioner has a liberty interest in collaterally attacking constitutional violations occurring during trial, the State has a legitimate interest in enacting procedural rules in the post-conviction context to prevent "the litigation of stale and fraudulent claims," *Burford*, 845 S.W.2d at 208, quoting *Jimenez v. Weinberger,* 417 U.S. 628, 636, 94 S.Ct. 2496, 2501, 41 L.Ed.2d 363 (1974), and to curtail "the cost to the state of continually allowing prisoners to file usually fruitless post-conviction petitions." *Burford,* 845 S.W.2d at 207.

Although we held that the post-conviction limitations period was not facially unconstitutional, we also stated that the time bar could cause due process problems in certain factual situations. After consulting relevant United States Supreme Court and Tennessee law, we concluded that the limitations period would only violate the due process clauses in a particular case if it denied to the defendant "a reasonable opportunity to have the

claimed issue heard and decided." *Id.* at 208.

Having set forth the appropriate constitutional test, we proceeded to apply it to that case, first addressing the State's and then the petitioner's interest:

There is nothing stale or fraudulent about the petitioner's claim. Although he filed his petition outside the time limits provided by the statute of limitations, there is no difficulty here with the availability of witnesses or the memories of witnesses. Nor is there a problem with respect to a groundless claim generating excessive costs. It is abundantly clear that the petitioner has a valid claim to have his sentence reduced, and all the Trousdale County court will have to do is examine the record of the Wilson County proceedings. The Trousdale County court can then re-sentence Burford using the appropriate considerations set forth in the Criminal Sentencing Reform Act. Accordingly, we find that the governmental interest represented by Tenn.Code Ann. § 40–30–102 is not served by applying the statute to bar Burford's petition.

Moreover, although the Post–Conviction Procedure Act only provides an opportunity to litigate constitutional attacks upon prior convictions, which we have already determined is not a fundamental right, application of the statute to bar Burford's petition in this case will deny him of a fundamental right. If consideration of the petition is barred, Burford will be forced to serve a persistent offender sentence that was enhanced by previous convictions that no longer stand. As a result, Burford will be forced to serve an excessive sentence in violation of his rights under the Eighth Amendment to the U.S. Constitution, and article I, § 16 of the Tennessee Constitution, which, by definition, are fundamental rights entitled to heightened protection.

*Id.* (citations omitted.) Thus, we concluded that the limitations period was unconstitutional as applied to Burford.

We recently had the occasion to revisit *Burford* in *Sands v. State,* 903 S.W.2d 297 (Tenn.1995). In that case, we attempted to summarize *Burford* and to enunciate a clear procedure for its application by the trial courts:

It will be helpful to summarize the basic rule to be derived from *Burford:*

that, in certain circumstances, due process prohibits the strict application of the post-conviction statute of limitations to bar a petitioner's claim when the grounds for relief, whether legal or factual, arise after the 'final action of the highest state appellate court to which an appeal is taken'— or, in other words, when the grounds arise after the point at which the limitations period would normally have begun to run. In applying the *Burford* rule to specific factual situations, courts should utilize a three-step process: (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are 'later-arising,' determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in 'collaterally attacking constitutional violations occurring during the conviction process,' against the State's interest in preventing the litigation of 'stale and fraudulent claims.'

*Sands,* 903 S.W.2d at 301 (citations omitted.)

■ With *Burford* and *Sands* clearly in mind, we turn to the contentions of the parties in this case. The State first argues that *Burford* should not apply here because the claim was not "later-arising" under the second prong of the *Sands* formulation. The State argues that the claim was not "later-arising" because the petitioner had sufficient information in 1981 and 1982—at the time of his trials for the murders of Carl Lipford and Larry Climer—to put him on notice that he could bring a claim for pretextual arrest. The State advanced this argument for the first time in its petition to rehear filed with the Court of Criminal Appeals. In that petition, it attached excerpts from the transcripts of the Lipford and Climer murder

trials which contain, it says, testimony from law enforcement officials clearly indicating that the arrest was pretextual.

We cannot accept this argument. First, while it is true that a post-conviction court can take judicial notice of prior proceedings in the same case, *Delbridge v. State,* 742 S.W.2d 266 (Tenn.1987), the State's method of presenting this evidence was inappropriate in that it did not afford the defendant any means of responding to that evidence. Furthermore, and more importantly, the material submitted by the State is essentially ambiguous as to the nature of the arrest. While some of the material might be read to support the notion that the arrest was pretextual, all the officers testified that the defendant was arrested for public drunkenness, and that he was indeed intoxicated at the time. Therefore, we cannot conclude that the defendant should have known that he had a claim for a pretextual arrest in 1981 or 1982.[4]

The State alternatively argues that *Burford* should not apply because the petitioner's interest in attacking any constitutional error occurring during his trial is outweighed by the legitimate State interests in a strict enforcement of the limitations period. As we did in *Burford,* we must carefully weigh the interests of both parties to determine if due process requires the suspension of the limitations period so as to afford the petitioner a reasonable opportunity to litigate the claim.

First, it is beyond question that the State interests here are much stronger than in *Burford.* With respect to the interest in preventing the litigation of stale claims, we note that the events at issue here occurred almost fifteen years ago. Because the officers involved will likely be called to testify

regarding the arrest and the ensuing events, there is a real danger that their memories will have faded to such a degree as to make reconstructing the events difficult or impossible. Moreover, there is the possibility that the officers may not even be available to testify, another concern voiced in *Burford.* Thus, all the dangers inherent in the litigation of stale claims—which the State has a legitimate interest in preventing—appear to be present here.

The other State interest enunciated in *Burford*—that of preventing excessive costs—is also implicated here. In stark contrast to *Burford,* where the petitioner was merely required to present the Wilson County judgment to ensure success on his claim, the petitioner here must successfully litigate several issues relating to the allegedly pretextual arrest before he receives any benefit at all from the claim. The Court of Criminal Appeals ably summarized the substantial litigative hurdles facing the petitioner:

> These conclusions, however, do not necessarily require any grant of relief. First, even if the arrest was illegal, that alone is of no help to this petitioner. There is no constitutional immunity from an unlawful arrest. The fact that an accused has been unlawfully arrested only becomes relevant when evidence tainted by the unlawful arrest is sought to be introduced by the state. [For example,] an illegal warrantless arrest or an arrest made under the color of an invalid warrant has no adverse effect upon an indictment or a presentment returned by a grand jury subsequent to the arrest. Even if an arrest is illegal, a confession which follows might often be purged of the primary taint.

.     .     .     .     .

---

4. As an alternative argument on the "later-arising" issue, the State asserts that the law enforcement radio logs relied upon by the defendant were available long before the Court of Appeals released its decision in *Capital Case Resource Center v. Woodall,* 1992 WL 12217 in 1992. In fact, the State asserts that the logs were actually available as early as 1986, when this Court held, in *Memphis Publishing Co. v. Holt,* 710 S.W.2d 513 (Tenn.1986), that "closed" police files were subject to inspection under the Tennessee Public Records Act. Thus, the State concludes, the de-

fendant was not justified in waiting so long to file his claim. We also reject this contention.*/ Holt* cannot be deemed to have decided the issue, as the precise issue presented in *Woodall* was whether the prosecution and police records of a case *under collateral attack* were in fact "closed" for purposes of the Act. Furthermore, as justification for their refusal to grant this petitioner access to prosecution files, law enforcement officials cited the ongoing *Woodall* litigation as evidence that the issue had not been resolved by the courts.

Finally, even if a confession is found to be inadmissible as the fruit of an illegal arrest, any error by its introduction into evidence might be harmless in light of the other evidence.

(citations omitted.)

Therefore, on remand the petitioner would first have to establish that the arrest was in fact pretextual; if this is established, he would then have to litigate the suppression issue; and finally, if this is successful, he would have to litigate the harmless error issue. This hearing will thus require the litigation of several possibly complex legal issues, all at substantial costs to the State.

On the other hand, we acknowledge that the petitioner has an interest in challenging the constitutional error allegedly made during his trial. Furthermore, we acknowledge that the right to be free from unreasonable seizures is in a sense "fundamental" in that it is included in the text of the Fourth Amendment to the United States Constitution and Art. I, § 7 of the Tennessee Constitution. *See* Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure, § 15.7 (2d ed. 1992). However, it is important to recognize that the precise claim at issue here—the "right" to suppress evidence garnered as a result of an unreasonable seizure—is very different in kind from the "fundamental" right at issue in *Burford*—the right to be free from an excessive sentence.[5] The right at issue in *Burford* is a *personal trial* right of a defendant which goes directly to the *justice or integrity* of the conviction or sentence. On the other hand, the "right" to exclude evidence gathered as a result of an unreasonable seizure, based as it is on the rationale of deterring police misconduct, is not a personal trial right. And a violation of the constitutional guarantees, if proven, does not necessarily result in a reversal of the conviction.

Two United States Supreme Court cases will serve to illustrate this point. In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Court held that a prisoner is not entitled to raise a Fourth Amendment claim in a habeas corpus proceeding where the State has afforded a full and fair opportunity to litigate the claim in state court. This holding was based, in part, on the nature of a Fourth Amendment claim. The *Stone* court explained:

The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights. Post–*Mapp* decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure, for any 'reparation comes too late.'

*Stone,* 428 U.S. at 486, 96 S.Ct. at 3048. The Court also reasoned that:

'A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond virtually any shadow of a doubt that the defendant is guilty.'

Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice.

*Stone,* 428 U.S. at 490–91, 96 S.Ct. at 3050–51 (citations omitted).

In contrast, in *Withrow v. Williams,* 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), the Court considered the Government's argument that *Stone* should be extended to bar petitioners from raising claims

---

5. This right is guaranteed by the Eighth Amendment to the United States Constitution and Art. I, § 16 of the Tennessee Constitution.

in habeas corpus proceedings based on violations of *Miranda* rights. In rejecting this argument, the Court reasoned:

> As we explained in *Stone,* the *Mapp* rule is 'not a personal constitutional right,' but serves to deter future constitutional violations; although it mitigates the juridical consequences of invading the defendant's privacy, the exclusion of evidence at trial can do nothing to remedy the completed and wholly extrajudicial Fourth Amendment violation. Nor can the *Mapp* rule be thought to enhance the soundness of the criminal process by improving the reliability of evidence introduced at trial. Quite the contrary, as we explained in *Stone,* the evidence excluded under *Mapp* 'is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant.'
>
> *Miranda* differs from *Mapp* in both respects. 'Prophylactic' though it may be, in protecting a defendant's Fifth Amendment privilege against self-incrimination *Miranda* safeguards a 'fundamental *trial* right.' The privilege embodies 'principles of humanity and civil liberty, which had been secured in the mother country only after years of struggle,' and reflects 'many of our fundamental values and most noble aspirations'
>
> .   .   .   .   .
>
> Nor does the Fifth Amendment 'trial right' protected by *Miranda* serve some value necessarily divorced from the correct ascertainment of guilt. 'A system of criminal law enforcement which comes to rely on the confession will, in the long run, be less reliable and more subject to abuses than a system relying upon independent investigation.' By bracing against 'the possibility of unreliable statements in every instance of in-custody interrogation,' *Miranda* serves to guard against 'the use of unreliable statements at trial.'

*Withrow,* 507 U.S. at 691, 113 S.Ct. at 1753 (citations omitted) (emphasis in original). *See also Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986) (declining to extend *Stone* to certain claims of ineffective assistance of counsel, a Sixth Amendment "fundamental" right that

"assures the fairness, and thus the legitimacy, of our adversary process"); *Jackson v. Virginia,* 443 U.S. 307, 323, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979)(declining to extend *Stone* to bar habeas consideration of a Fourteenth Amendment due process claim of insufficient evidence to support the conviction, reasoning that such a claim was "central to the basic issue of guilt or innocence"); and *Rose v. Mitchell,* 443 U.S. 545, 563, 99 S.Ct. 2993, 3003, 61 L.Ed.2d 739 (1979) (declining to extend *Stone* to preclude habeas review of an equal protection claim of racial discrimination in selecting a state grand-jury foreman, reasoning that such a claim implicated the integrity of the judicial process). Therefore, it is abundantly clear that a Fourth Amendment claim is not substantively on par with other constitutional guarantees afforded to criminal defendants; and the petitioner's interest is litigating the unreasonable seizure claim is accordingly lesser.

In summation, after carefully balancing the legitimate State interests of precluding stale claims and limiting excessive costs with the petitioner's interest in litigating this particular constitutional claim, we conclude that the State's interests are weightier. Because the strict enforcement of the limitations period does not serve to deprive the petitioner of a reasonable opportunity to litigate his claim under *Burford,* the judgment of the Court of Criminal Appeals is hereby reversed, and the petition for post-conviction relief dismissed.

ANDERSON, C.J., and REID, BIRCH and WHITE, JJ., concur.